Reversed and Remanded and Opinion filed March 30, 2006









Reversed and Remanded and Opinion filed March 30, 2006.

 

 

In The

 

Fourteenth Court of Appeals

____________

 

NO.
14-03-01444-CV

____________

 

WAREHOUSE ASSOCIATES CORPORATE CENTRE II, INC., WAREHOUSE ASSOCIATES
CORPORATE CENTRE POST OAK, LTD., AND WAREHOUSE ASSOCIATES DEVELOPMENT, INC.,
Appellants

 

V.

 

CELOTEX CORPORATION, LECIL M. COLBURN, AND DAVID MURRY,
Appellees

 



 

On
Appeal from the 127th District Court

Harris County, Texas

Trial
Court Cause No. 01-11968

 



 

O P I N I O N








This case arises out of the sale of real property under a
contract that contains as-is and waiver-of-reliance provisions.  After the sale, the buyer discovered asbestos
in the soil on the property and brought suit against the seller and its
employees alleging common law fraud, statutory fraud, and negligent
misrepresentation.  The main issue on
appeal is whether the trial court correctly granted summary judgment based on
the contract=s as-is and waiver-of-reliance
provisions.  We first discuss the effect
of the Texas Supreme Court=s decision in Schlumberger Tech. Corp. v. Swanson on
its prior opinion in Prudential Ins. Co. of America v. Jefferson Assocs.,
Ltd.  We then conclude that the trial court erred in
granting summary judgment as to the fraudulent-inducement exception to the
enforceability of the as-is and waiver-of-reliance provisions because the
summary-judgment evidence raises a fact issue as to whether the seller=s alleged fraudulent representations
or concealment of information induced the buyer to enter into this
contract.  However, we also conclude that
the summary-judgment evidence proves as a matter of law that the seller did not
impair, obstruct, or interfere with the buyer=s inspection of the property, which,
if proved, would have defeated enforceability of the as-is and
waiver-of-reliance provisions in the sales contract.  Because there is a fact issue as to the
fraudulent-inducement exception, we reverse the trial court=s judgment and remand for further
proceedings consistent with this opinion.

                              I. 
Factual and Procedural Background 








This dispute between sophisticated parties involves
approximately twelve acres of land at 1400 North Post Oak Road in Houston,
Texas (the AProperty@). 
Appellee Celotex Corporation operated an asphalt shingle manufacturing
plant on the Property for a number of years until 1998, when Celotex
permanently closed the plant.  Celotex
decided to sell the Property and retained Cushman & Wakefield as its real-estate
broker.  While Cushman & Wakefield
was entertaining bids for the Property, Warehouse Associates[1]
asked Cushman & Wakefield for any documents that Celotex had regarding the
Property.  In response, Celotex forwarded
part of a 1996 environmental report prepared for Celotex.  The part of this report Celotex produced
indicates that there had been asbestos issues relating to the buildings on the
Property but indicates nothing about asbestos contamination in the soil or use
of asbestos in the manufacturing process on the Property, as opposed to
asbestos in building materials in the structures on the Property.  Celotex did not give Warehouse Associates the
part of the report stating that asbestos previously had been used in the
manufacturing process at the plant on the Property.  

                                            Contract
for the Sale of the Property

After receiving various offers and inquiries, on January 24,
2000, Celotex entered into a written contract with appellant Warehouse
Associates Development, Inc. for the sale of the Property (the AContract@). 
The Contract provided for a purchase price of $3.25 per square foot, or
a total of approximately $1.7 million. 
The Contract recited that Celotex had begun demolition of all existing
structures on the Property down to the slab level and that Celotex would use
its best efforts to cause such demolition work to be completed as soon as
possible. Celotex agreed to send a notice to Warehouse Associates upon
completion of this demolition work. 
Under the Contract, Warehouse Associates was allowed to inspect the
Property within sixty days from the date Celotex gave notice that it had
completed this demolition work.  During
this sixty-day inspection period, Warehouse Associates had the right to
terminate the Contract by written notice if its inspections revealed conditions
unsatisfactory to it in its sole discretion. 


            Seller=s Disclaimer of Warranties, Promises,
Covenants, and Guaranties








In the Contract, the parties agreed that, other than the
warranties of title contained in the deed, Celotex did not make and was
specifically disclaiming any representations, warranties, promises, covenants,
or guaranties of any kind.  The Contract
imposed no obligation on Celotex to provide documents or records relating to
the Property=s condition.  Warehouse Associates, however, was entitled
to conduct inspections, tests, and investigations as it deemed necessary to
determine the suitability of the Property for its intended use.  Unless Warehouse Associates terminated the
Contract before the inspection period expired, Warehouse Associates would be
obligated to close the transaction, and, upon closing, Warehouse Associates
would assume all existing and future liabilities associated with the ownership,
use, and possession of the Property, including any liabilities imposed by
local, state, or federal environmental laws or regulations. 

                                  Buyer=s Right to Inspect and Waiver of
Reliance

In the Contract, Warehouse
Associates, as the buyer, acknowledged that it had the opportunity to inspect
the Property and agreed that it was relying solely on its own inspection and
investigation of the Property and not on any information from Celotex.  The parties also agreed that the sale of the
Property at closing would be on an Aas is, where is@ condition and basis Awith all faults.@ 
On February 10, 2000, Celotex gave notice that it had completed
demolition of the buildings down to the slabs, triggering the buyer=s sixty-day inspection period that
ended on April 10, 2000.  

                           Occurrences
After Commencement of Inspection Period

On the day that the inspection period began, Celotex=s contractor was excavating soil on
the Property and found what appeared to the contractor to be raw, friable
asbestos buried in the ground.  The
contractor contacted appellee Lecil M. Colburn, Celotex=s Director of Environmental Affairs
and chairman of a Celotex committee formed to sell various Celotex
properties.  The contractor asked Colburn
what to do and Colburn instructed the contractor to leave that area of the
Property alone and to backfill the excavated area, indicating the matter would
be addressed at a later date.  The
contractor had one employee, wearing a respirator, backfill the excavation as
quickly as possible.  








During the relevant period, HBC Engineering, Inc. (AHBC@) inspected the Property and
conducted a Phase I Environmental Site Assessment of the Property.  HBC had discussions about the Property with
Colburn and with David Murry, a shipping supervisor for Celotex.  HBC did not specifically ask Colburn about
asbestos, and Colburn said nothing to HBC about asbestos or the recent
discovery of suspected asbestos-containing material buried in the ground on the
Property.  Colburn listed the major raw
materials Celotex had used in its shingle-manufacturing process without
mentioning asbestos. He also stated his belief that Celotex=s predecessor had used a similar
shingle-manufacturing process.  At the
end of his interview with Colburn, an HBC representative asked Colburn if he
was aware of any other environmental concerns, and Colburn said nothing about
the suspected asbestos-containing material recently discovered on the Property
or about the possibility of asbestos being buried in the soil on the Property.
HBC also conducted an environmental site investigation that included analysis
of soil and groundwater samples taken from the Property.  HBC did not test the soil for the presence of
asbestos.  In its reports to the buyer,
HBC did not mention anything about any contamination of the soil on the
Property due to asbestos.  

                                                Buyer=s Discovery After the Sale

Warehouse Associates did not exercise its right to terminate
the Contract during the inspection period. 
On May 24, 2000, the sale closed and Celotex conveyed title to the
Property to appellant Warehouse Associates Corporate Centre Post Oak, Ltd. by a
special warranty deed that contains the same waiver-of-reliance and as-is
language as the Contract.  In August
2000, a contractor demolishing the concrete slabs discovered
asbestos-containing material in the soil on the Property. An expert analyzed
soil borings and detected more than one percent asbestos in forty-four of
seventy soil borings from sites across the Property.  This expert concluded that the Property has
extensive, widespread asbestos-containing material in the soil to a depth of at
least thirteen feet below the ground surface. 


                                                      Claims
and Counterclaims








Appellants Warehouse Associates Corporate Centre II, Inc.,
Warehouse Associates Corporate Centre Post Oak, Ltd., and Warehouse Associates
Development, Inc. (collectively referred to herein as AWarehouse Associates@) filed claims against appellees
Celotex, Colburn, and Murry (the ACelotex Parties@), alleging damage claims for common
law fraud, negligent misrepresentation, and statutory fraud under section 27.01
of the Texas Business and Commerce Code. 
Warehouse Associates also sought the equitable remedy of rescission of
the transaction, as well as punitive damages and attorney=s fees.  The Celotex Parties counterclaimed against
Warehouse Associates asserting various claims. 


                                                Motions
for Summary Judgment

Warehouse Associates filed a motion for summary judgment
seeking dismissal of the Celotex Parties= counterclaims.  The Celotex Parties filed a seventy-page
traditional motion for summary judgment, as well as more than 1,700 pages of
summary-judgment evidence.  In their
motion, the Celotex Parties asserted the following independent grounds in
support of a take-nothing judgment in their favor:

(1)       As a matter of law, Warehouse Associates may not assert it
relied upon the Celotex Parties= representations because Warehouse Associates
conducted its own independent investigation of the environmental condition of
the Property and the Celotex Parties did not interfere with this investigation
in any manner. 

(2)       The waiver-of-reliance and as-is language in the Contract and
the deed negate the essential element of reliance as a matter of law.  

(3)       Warehouse Associates=s claims
are barred by the doctrines of estoppel by contract and estoppel by deed.








The trial court granted a take-nothing summary judgment in
favor of the Celotex Parties as to all of Warehouse Associates=s claims.[2]  The trial court also granted Warehouse
Associates=s motion for summary judgment and
dismissed all of the Celotex Parties= counterclaims, except the
counterclaim seeking attorney=s fees, expenses, and costs under a provision in the Contract
allowing such recovery to the prevailing parties in any claim or controversy
relating to the Contract.[3]  Subsequently, the trial court granted summary
judgment in favor of the Celotex Parties on this counterclaim, awarding them
more than $2,000,000 in attorney=s fees, expenses, and costs.  The trial court signed a final judgment
setting out all of its summary-judgment rulings.  

Although Warehouse Associates has appealed the dismissal of
its claims, the Celotex Parties have not appealed the trial court=s dismissal of their counterclaims or
the trial court=s denial of their request for summary judgment compelling
Warehouse Associates to accept Celotex=s tender to buy back the Property.

                                                       II. 
Issues Presented 

Warehouse Associates presents the following issues for
appellate review:

(1)       Is a seller of real property who (a) knowingly conceals and
intentionally fails to disclose environmental hazards to a buyer and (b)
interferes with the buyer=s investigation of the property nevertheless immunized
from fraud and misrepresentation claims because the sales contract and warranty
deed contain an Aas is B no reliance@ clause?

(2)       Is a seller of real property who (a) actively conceals or
purposefully fails to disclose material information about the environmental
condition of the property or (b) provides misleading information to the buyer
immunized from fraud and misrepresentation claims because the buyer undertook
investigation of the Property?

(3)       Does the doctrine of estoppel by contract or deed apply to a
fraudulently induced contract or deed?

(4)       May a buyer
recover lost profits when a seller has fraudulently induced the sale of
commercial property?

                                                   III. 
Standard of Review 








In reviewing a traditional motion for
summary judgment, we take as true all evidence favorable to the nonmovant, and
we make all reasonable inferences in the nonmovant=s favor.  Dolcefino v. Randolph, 19 S.W.3d 906, 916
(Tex. App.C Houston [14th Dist.] 2000, pet.
denied). If the movant=s motion and summary-judgment evidence facially establish its
right to judgment as a matter of law, the burden shifts to the nonmovant to raise
a genuine, material fact issue sufficient to defeat summary judgment.  Id. 
Because the trial court did not specify the grounds upon which it
granted a take-nothing summary judgment in favor of the Celotex Parties,
Warehouse Associates must show that each independent ground alleged in the
motion for summary judgment is insufficient to support the judgment granted. See  Caldwell v. Curioni, 125 S.W.3d 784,
789 (Tex. App.CDallas 2004, pet. denied).

                                                                 IV. 
Analysis

A.        To
what extent, if any, did Schlumberger Technology Corp. v. Swanson change
the legal standard used in Prudential Insurance Co. of America v. Jefferson
Associates, Ltd. to determine whether the as-is and waiver-of-reliance
language defeats the buyer=s fraud claims as a matter of law? 








In Prudential Insurance Co. of America v. Jefferson
Associates, Ltd., the Texas Supreme Court limited the enforceability of
as-is and waiver-of-reliance language to exclude situations in which (1) the
buyer was induced to enter into the contract containing that language by a
fraudulent representation or concealment of information by the seller or (2)
the seller engaged in conduct that impaired, obstructed, or interfered with the
buyer=s inspection of the property being
sold.[4]  See 896 S.W.2d 156, 160B62 (Tex. 1995).  In this opinion, we refer to these exceptions
as the Afraudulent-inducement exception@ and the Aimpairment-of-inspection exception,@ respectively.  Before determining if the summary-judgment
evidence raises fact issues as to these APrudential exceptions,@ we address the Celotex Parties= argument under Schlumberger
Technology Corp. v. Swanson that the as-is and waiver-of-reliance language
in the Contract is enforceable even if such fact issues exist.  959 S.W.2d 171 (Tex. 1997).  After carefully reviewing Schlumberger,
we are compelled by the Texas Supreme Court=s analysis in that case to disagree
with this argument.  The Schlumberger
court=s analysis leads us to conclude that
the two Prudential exceptions still stand, subject to a small exception
to the fraudulent-inducement exception carved out by Schlumberger, which
does not apply in the instant case.

In Schlumberger, Schlumberger Technology Corporation
wanted to buy the Swansons= interest in an underwater diamond mining operation.  See id. at 173B74. 
After becoming embroiled in a dispute with Schlumberger over their
interest=s value, the Swansons agreed to a
price and sold their interest to Schlumberger. 
See id. at 174.  As part of
this sale, the Swansons executed a release specifically noting the dispute as
to the interest=s value, providing for a release of all of the Swansons= claims regarding this interest, and
containing a waiver-of-reliance provision. 
See id. at 180.  The
Swansons later sued Schlumberger, asserting that Schlumberger fraudulently
induced them to enter into this transaction. 
See id. at 174.  








In discussing the enforceability of the waiver-of-reliance
provision, the Texas Supreme Court began with a presumption that, as found by
the jury, Schlumberger had fraudulently induced the Swansons to enter into the
transaction and sign the release.  See
id. at 174, 178.  The Texas Supreme
Court rejected Schlumberger=s argument that, as long as the releasing party was
represented by counsel in an arms-length transaction, a waiver-of-reliance
provision in a release bars a claim that the releasing party was fraudulently
induced to sign the release.  See id.
at 175, 178.  The Schlumberger
court observed that some
Texas Supreme Court precedents hold that a release can be set aside upon proof
of fraudulent inducement, even if the release contains a waiver-of reliance
provision.  See id. at 178.  However, the Schlumberger court also acknowledged that other cases
reached the opposite result.  See id. at
178B79. 
The Texas Supreme Court then stated that it resolved these two
conflicting lines of authority in Dallas Farm Machinery Co. v. Reaves, a
case decided four decades earlier, in which it adhered to the former line of
cases that refuse to enforce fraudulently induced waiver-of-reliance
provisions.  See id. at 179
(discussing Dallas Farm Machinery Co. v. Reaves, 307 S.W.2d 233 (Tex. 1957)). 
The Schlumberger court observed that the holding in Dallas Farm Machinery brought Texas law
into harmony with the great weight of authority, the Restatement of Contracts,
and the views of eminent legal scholars. 
See id.  








After seeming to
embrace Dallas Farm Machinery Co., the Schlumberger court then
stated that juxtaposed against this authority is a competing concernCthe ability of the
parties to fully and finally resolve disputes between them.  See id.  Reasoning that parties should be able to
bargain for and execute a release barring all further disputes, the Schlumberger
court opined that circumstances should exist under which a contracting party
can clearly and specifically disclaim reliance on misrepresentations of another
party so as to defeat a claim of fraudulent inducement as a matter of law.  See id.  The Schlumberger court then gave as an
example, a disclaimer of reliance conclusively negating the element of
reliance, which is essential to a fraudulent inducement claim.  To illustrate this example, the Schlumberger
court cited  Prudential Insurance Co.,
896 S.W.2d at 161B62, and Estes v. Hartford Accident & Indemnity Co., 46 S.W.2d 413,
417B18 (Tex. Civ. App.CEl Paso 1932, writ
ref=d).  See id.  Though the Prudential case did enforce
waiver-of-reliance language in a contract, the part of that opinion cited by
the Schlumberger court cites Dallas Farm Machinery Co. and notes that such language is not
enforceable against a buyer induced to enter into the contract by the seller=s fraudulent
representation or concealment of information. 
See Prudential Ins. Co., 896 S.W.2d at 161B62.  The other Texas Supreme Court precedent cited
by the Schlumberger court, Estes v. Hartford Accident & Indemnity
Co., held that the record contained no evidence of reliance on the alleged
fraudulent misrepresentation that allegedly induced a party to sign a
release.  See Estes, 46 S.W.2d at
417B18.  However, there is no mention in Estes
that the release contained a waiver-of-reliance clause, and the court states
that the release would not be enforceable if the releasor had proved fraud upon
which he relied in signing the release.  See
id. at 417.  

The Schlumberger court described
the circumstances in which waiver-of-reliance language would negate proof of
fraudulent inducement as follows:

The contract and
the circumstances surrounding its formation determine whether the disclaimer of
reliance is binding. Because the parties were attempting to put an end to their
deal, and had become embroiled in a dispute over the feasibility and value of
the project, we conclude that the disclaimer of reliance the Swansons gave
conclusively negates the element of reliance.

Schlumberger Tech. Corp.,  959 S.W.2d at 179B80 (citations
omitted).

The Schlumberger court found it
significant that, throughout the negotiations that led to the execution of the
release, the parties disagreed about the value of the Swansons= interest.  See id. at 180.  The Schlumberger
court stated that the sole purpose of the release was to end the dispute as to
the value of the commercial project once and for all.  See id. 
Noting that the Swansons unequivocally disclaimed reliance upon
representations by Schlumberger about the project=s value, the Schlumberger
court concluded that, in light of this language and in this context, the
Swansons must have intended to forego reliance on any representations about the
value of the project, given that this was the very dispute the release was
supposed to resolve.  See id. 









In concluding, the
Schlumberger court emphasized that a waiver-of-reliance clause will not
always bar a fraudulent-inducement claim and noted that the Prudential
case had identified some circumstances in which an as-is clause would not
preclude a fraudulent-inducement claim.  See
id.  (citing Prudential Ins. Co.,
896 S.W.2d at 162).  Again, the part of Prudential
cited by the Schlumberger court includes a citation to Dallas Farm
Machinery Co. and states that the buyer would not have been bound by the
as-is provision (which contained waiver-of-reliance language) if it had been induced to enter into the contract
by the fraudulent representation or concealment of information by the seller.  See id; Prudential Ins. Co. of Am., 896 S.W.2d at 162.  After indicating that the Prudential
exceptions are still valid, the Schlumberger court stated, AWe conclude only
that on this record, the disclaimer of reliance conclusively negates as
a matter of law the element of reliance on representations about the
feasibility and value of the sea‑diamond mining project needed to support
the Swansons= claim of fraudulent inducement.@   See id. at 181 (emphasis added). 

The Prudential court set forth two
exceptions to the enforceability of as-is or waiver-of-reliance language in a
contract.[5]  See Prudential Ins. Co. of Am., 896 S.W.2d at 162.  One of these exceptions is inducement of the
complaining party to enter into the contract by the fraudulent representation
or concealment of information by the party seeking to enforce the contractual
language.  See id.  The Schlumberger court indicated that
both exceptions from Prudential are still valid but also held that under
the circumstances shown by the record in Schlumberger, fraudulent
inducement did not prevent enforcement of the waiver-of-reliance language in
the release between Schlumberger and the Swansons.  See Schlumberger Tech. Corp., 959
S.W.2d at 179B81. 









Schlumberger allowed a party to enforce a waiver-of-reliance clause even
though the court presumed, as found by the jury, that the party in question
fraudulently induced the other parties to enter into the contract containing
that clause.  See id. at 175, 178B81. 
If we were to read Schlumberger broadly, this holding likely would
be applied in many cases based on such commonly existing factors as (1) an arm=s length transaction between
sophisticated parties represented by counsel and (2) waiver-of-reliance
language that clearly and unequivocally covers the specific representations on
which the complaining party allegedly relied. 
However, the Schlumberger court itself stated that an arm=s length transaction between parties
represented by counsel is not enough to enforce a waiver-of-reliance
clause.  See id. at 175, 178.  Furthermore, a broad reading of Schlumberger
effectively would overrule the Prudential fraudulent-inducement
exception that Schlumberger and many other authorities indicate is still
good law.  See Geodyne Energy
Income Prod. P=ship I-E v. Newton Corp., 161 S.W.3d 482,
487, 490 & n.32 (Tex. 2005) (holding that quitclaim deed containing as-is
language did not violate Texas Securities Act but citing the two Prudential
exceptions and stating that analysis would be different if there were evidence
of fraudulent inducement); Schlumberger Tech. Corp., 959 S.W.2d at 181; Kane
v. Nxcess Motorcars, Inc., No. 01-04-00547-CV, 2005 WL 497484, at *6B7 (Tex. App.CHouston [1st
Dist.] Mar. 3, 2005, no pet.) (holding in memorandum opinion that trial court
erred in granting summary judgment based on as-is clause because of fact issues
as to fraudulent-inducement exception under Prudential);  Bynum v. Prudential Residential Services,
Ltd. P=ship, 129 S.W.3d 781, 787B92 (Tex. App.CHouston [1st
Dist.] 2004, pet. denied) (applying Prudential exceptions to contract
containing both waiver-of-reliance and as-is language and determining that
summary-judgment evidence did not raise a fact issue as to these exceptions); Nelson
v. Najm, 127 S.W.3d 170, 173, 175B76 (Tex. App.CHouston [1st
Dist.] 2003, pet. denied) (applying Prudential analysis to contract
containing both waiver-of-reliance and as-is language and determining that such
language did not bar fraud claims because there was evidence that seller
fraudulently induced buyer to enter into contract by fraudulent
concealment).  Schlumberger
expressly preserves the Prudential exceptions while, at the same time,
on the facts Ain [the Schlumberger] record,@ it forecloses
application of the fraudulent-inducement exception from Prudential.  We must reconcile these two aspects of Schlumberger
to discern its application in this case.








Upon careful consideration of the entire
opinion in Schlumberger, we conclude that the decisive
factor in the case was the contracting parties= mutual intent to
definitively resolve a long-running dispute in which they had been embroiled.[6]  The Schlumberger court held that the
fraudulent-inducement exception from Prudential does not apply to
waiver-of-reliance language (1) that clearly and unequivocally disclaims
reliance on the specific representations that are the basis of the claims in
question, (2) in a contract whose purpose is to definitively end a dispute in
which the contracting parties have been embroiled, (3) in an arm=s length transaction between
sophisticated parties represented by counsel.[7]  See Schlumberger Tech. Corp., 959
S.W.2d at 179B81. 
Because the Contract=s purpose was not
to definitively end a dispute in which Celotex and Warehouse Associates had
been embroiled, this case does not fall within the scope of Schlumberger,
and therefore, the two Prudential exceptions provide the legal standard.[8]

B.        Is there a
genuine issue of material fact as to the two Prudential exceptions?

In their
traditional motion for summary judgment, the Celotex Parties asserted that the
following waiver-of-reliance and as-is language in the Contract and the deed
negates reliance by Warehouse Associates as a matter of law:








OTHER THAN THE WARRANTIES OF TITLE CONTAINED IN THE
DEED, PURCHASER ACKNOWLEDGES AND AGREES THAT SELLER HAS NOT MADE, DOES NOT MAKE
AND SPECIFICALLY DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, PROMISES,
COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER,
WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS
TO, CONCERNING OR WITH RESPECT TO (A) THE NATURE, QUALITY OR CONDITION OF THE
PROPERTY, INCLUDING WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY, (B) THE
INCOME TO BE DERIVED FROM THE PROPERTY, (C) THE SUITABILITY OF THE PROPERTY FOR
ANY AND ALL ACTIVITIES AND USES WHICH PURCHASER MAY CONDUCT THEREON, (D) THE
COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES,
ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY. . .
(E) THE HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF
THE PROPERTY, OR (F) ANY OTHER MATTER WITH RESPECT TO THE PROPERTY, AND
SPECIFICALLY THAT SELLER HAS NOT MADE, AND DOES NOT MAKE AND SPECIFICALLY
DISCLAIMS ANY REPRESENTATIONS REGARDING SOLID WASTE, AS DEFINED BY THE U.S.
ENVIRONMENTAL PROTECTION AGENCY REGULATIONS AT 40 C.F.R., PART 261, OR THE
DISPOSAL OR EXISTENCE, IN OR ON THE PROPERTY, OF ANY HAZARDOUS SUBSTANCE, AS
DEFINED BY THE COMPREHENSIVE ENVIRONMENTAL RESPONSE COMPENSATION AND LIABILITY
ACT OF 1980, AS AMENDED, AND APPLICABLE STATE LAWS, AND REGULATIONS PROMULGATED
THEREUNDER.  PURCHASER FURTHER
ACKNOWLEDGES AND AGREES THAT HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE
PROPERTY, PURCHASER IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY
AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY THE SELLER.  PURCHASER FURTHER ACKNOWLEDGES AND AGREES
THAT ANY IN FORMATION [sic] PROVIDED OR TO BE PROVIDED WITH RESPECT TO THE
PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT SELLER HAS NOT MADE
ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION.  PURCHASER FURTHER ACKNOWLEDGES AND AGREES
THAT THE SALE OF THE PROPERTY AT CLOSING SHALL BE MADE ON AN AAS IS, WHERE IS@
CONDITION AND BASIS AWITH ALL FAULTS[.]@

(hereinafter the AContract Language@).








Warehouse Associates asserts the summary-judgment evidence raises a
genuine issue of material fact as to the two Prudential exceptions  (fraudulent-inducement and
impairment-of-inspection) to the enforceability of this Contract Language.  As discussed above, the existence of fact
issues as to either one of these Prudential exceptions would preclude
summary judgment based on the Contract Language.  See Geodyne Energy Income Prod. P=ship I-E, 161 S.W.3d at 487, 490 & n.32; Schlumberger
Tech. Corp., 959 S.W.2d at 181; Prudential Ins. Co. of Am., 896
S.W.2d at 162.

1.         Fraudulent Inducement

Warehouse Associates does not
complain of fraudulent inducement as to the 
presence of asbestos in the building materials used in the structures
that were demolished and removed by Celotex. 
Warehouse Associates asserts that the abatement of asbestos in these
structures did not cause them concern because it was Celotex=s responsibility to remove this
asbestos before closing.  Warehouse
Associates asserts that asbestos in building materials in the structures did
not alert it to the presence of asbestos buried in the soil on the
Property.  

Under the
applicable standard of review, the following summary-judgment evidence creates
a genuine issue of fact as to whether Celotex actually knew that asbestos was
in the soil on the Property:

!         An
August 14, 1999 Celotex memorandum regarding the status of demolition and
environmental activities and costs at the Property based on two meetings with
Colburn that states that A[t]he environmental work required relates to 1)
Asbestos in the ground . . . .@  

!         A
handwritten document regarding ASite Clean-Up@ at the
Property appears to project costs of cleaning up AOn Site
Soils@ at $1.5 million and notes, AThis is removal of some materials C not total removal of asbestos containing materials.@

!         An
internal Celotex budget shows that, for fiscal year 1999, Celotex budgeted $1.5
million for remediation of the soil on the Property, separate from amounts  budgeted for demolition of the structures,
remediation of drums and tank contents, removal of a tank farm and remediation
of the soil thereunder, and in-building asbestos removal.

!         Joe
Vela, who worked at the plant on the Property from 1951-91, testified that some
Celotex employees, including some of the managers, in the 1980s and 1990s knew
that asbestos-containing shingle pieces had been dumped in the ground on the
Property and knew that the plant on the Property had manufactured
asbestos-containing material.








!         In
negotiating the contract with its real-estate broker, Cushman & Wakefield,
Celotex removed from the draft contract a sentence in which Celotex represented
that it had no knowledge of toxic, contaminated, or hazardous substances or
conditions except as it had informed Cushman & Wakefield in writing.  Celotex replaced this language with a
sentence stating that Celotex represents that it will share information
relating to the environmental status of its properties.

Under the applicable standard of review, we also conclude
that there is a genuine issue of fact as to whether Celotex induced Warehouse
Associates to enter into the Contract by alleged fraudulent misrepresentation
or concealment of asbestos contamination in the soil on the Property.  We reach this conclusion based on the
following summary-judgment evidence:

!         On
October 28, 1999, Celotex=s broker sent Warehouse Associates a document that it
had received from CelotexCpart of a 1996 environmental assessment done for
Celotex.  In the cover letter that
accompanied this document, the broker stated, Aas you
will see from this report, there does not appear to be any major environmental
issues that would have an adverse effect on the property.@  The attached
document showed that asbestos was present in building materials used in the
structures on the Property.  However,
this assessment did not mention asbestos contamination in the soil on the
Property and did not mention that asbestos had ever been used as a raw material
in the manufacture of any product on the Property.  Celotex did not give Warehouse Associates the
part of this assessment stating that, in the past, asbestos had been used in
the manufacturing process to make roofing products on the Property and that the
manufacturing process typically generated waste that included Areject shingles.@ Celotex=s broker in this transaction testified that, if
Celotex had given him the part of this report that referred to asbestos being
used in the manufacturing process on the Property, he would have disclosed it
to Warehouse Associates because it pertains to the Property and should have
been revealed to Warehouse Associates.

!         In
response to Warehouse Associates=s
request for a site map of the Property, instead of producing a detailed 1988
map of the Property that Celotex had in its possession, Cushman & Wakefield
made a simpler map based on the 1988 map and produced the new map to Warehouse
Associates before Warehouse Associates signed the Contract.  The new map omitted many details about the
structures and past activities on the Property, including one notation
indicating that asbestos siding was manufactured on the Property.  Joe Vela used the term Aasbestos siding@ to
refer to asbestos roofing shingles.








!         Thomas
Martens, Manager of Environmental Services for HBC=s Houston office, testified that Murry of Celotex told
him on January 6, 2000, that Celotex had manufactured asphaltic roofing
shingles on the Property for a number of years (Martens thought he said about
twenty or thirty years).  Murry stated
that the raw materials used in this manufacturing process were a paper-type
material, a tar-like asphaltic material, and a granular sand-like
material.  Murry told Martens that,
before Celotex occupied the Property, there was another shingle-manufacturing
company that conducted manufacturing operations on the Property and that those
operations were similar to those of Celotex. Martens described his
conversations with Murry and Colburn to David R. David of Warehouse Associates
in Afair detail,@
including the description of the manufacturing process. 

!         Colburn
testified that, if he were buying a property, he would want to know the history
of the plant and also would want to know if asbestos had ever been used in
manufacturing in any way in that plant. Colburn also testified that during its
ownership of the Property, Celotex had manufactured Aasbestos roofing@ and
that a Amat material@
containing asbestos fiber was used in the manufacturing of shingles on the
Property at some time in the past.

!         David,
an authorized representative of Warehouse Associates, testified in his
affidavit that (1) Warehouse Associates had no knowledge concerning the
presence of asbestos or asbestos-containing materials in the soils on the
Property until August 2000; (2) before that time, the only knowledge Warehouse
Associates had was of asbestos in the structures on the Property; however,
under the Contract, those structures and the asbestos-containing materials
therein were to be completely removed and remediated before the closing of the
sale; (3) at no time before August 2000, was Warehouse Associates aware of
asbestos contamination in the soil on the Property.

!         Martens
of HBC testified that asbestos-containing materials are often found in
buildings but that the presence of asbestos-containing materials in buildings
does not raise a suspicion that asbestos is in the soil.








The Celotex Parties assert that Warehouse Associates knew
about the use and presence of asbestos on the Property before closing.  However, knowledge of the presence of
asbestos-containing materials in the structures to be removed by Celotex before
closing does not equate with knowledge of asbestos contamination that would
remain in the ground after closing or with knowledge that asbestos previously
had been used as a raw material in the manufacturing process on the
Property.  The Celotex Parties emphasize
that the purchase price under the Contract allegedly was set at approximately
half the Property=s fair market value if it were uncontaminated, because
Warehouse Associates allegedly knew that there was significant contamination on
the Property.  In support of this
argument, the Celotex Parties cite an April 27, 2000 appraisal of the Property
done for Warehouse Associates=s lender that valued the Property at $3,465,000, presuming no
environmental contamination.  This
appraisal, which was completed after the inspection period under the Contract
had expired, states that, according to a representative of Warehouse
Associates, the Property Awas believed to be contaminated and priced accordingly.@ 
At her deposition, the lender=s appraiser could not recall the
individual at Warehouse Associates to whom she referred in this statement.  The appraiser also stated that, from what she
recalled, the contamination to which she referred was contamination that had to
do with the buildings on the Property that were being demolished.  The summary-judgment evidence does not prove
as a matter of law that Warehouse Associates and Celotex discounted the
Property=s market value by fifty percent based
on environmental contamination.  Rather,
it includes testimony by Celotex=s own real-estate broker stating
that, with the structures, storage tanks, and equipment removed and presuming
no contamination, he believed the Afull market price@ for the Property was approximately
three dollars per square foot, which would yield a value of approximately
$1,613,000.  Under this valuation,
Warehouse Associates paid either fair market value or more than fair market
value for the Property, presuming it was not contaminated.  








The Celotex Parties also cite a one-page bankruptcy petition
as well as deeds and corporate records sent by the title company to Warehouse
Associates=s lawyer, who received these
documents on April 18, 2000.  The Celotex
Parties assert that these documents show that the Property had been owned by an
asbestos manufacturer and corporate predecessor of Celotex.  Warehouse Associates did not receive these
documents until after the inspection period had expired.  These documents show that Celotex filed
bankruptcy but do not reflect why it did so. 
Although the documents show that the Property had been owned by the
Philip Carey Manufacturing Company, they do not state that Philip Carey or any
other company manufactured asbestos products.[9]  The Celotex Parties also assert that HBC=s report shows that Warehouse
Associates knew that asbestos was commonly used in asphalt shingles; however,
the part of the HBC report cited states only that asbestos was commonly used in
construction materials.  It does not
refer to asphalt shingles.[10]  

The Celotex Parties also assert that the common use of
asbestos in asphalt products, including Celotex products, is a matter of common
knowledge.  The parts of the record the
Celotex Parties cite do not support this proposition, and the summary-judgment
evidence does not show as a matter of law that this information is common
knowledge. 

In sum, the summary-judgment evidence raises a genuine issue
of fact as to the Prudential fraudulent-inducement exception to the
enforcement of the Contract Language.  See
Kane, 2005 WL 497484, at *6B7 (holding that trial court erred in granting summary
judgment based on as-is clause because of fact issues as to
fraudulent-inducement exception under Prudential); Nelson, 127 S.W.3d at
175B76 (concluding
sufficient evidence supported trial court=s ruling that
as-is and waiver-of-reliance provisions should not be enforced based on
evidence that seller fraudulently induced buyer to enter into contract by concealment
of  existence of underground waste oil
storage tank).  Therefore,  the trial court erred in granting summary
judgment as to this issue, and we sustain Warehouse Associates=s first issue to this extent.








2.         Impairment of Inspection

Before we address the evidence
regarding impairment of inspection, we must determine the scope of this Prudential
exception.  In its briefing, Warehouse
Associates describes this exception broadly, stating that it applies if A[a] seller . . . interferes with the
buyer=s investigation of the
property.@[11] 
As explained below, we construe this exception more narrowly in
accordance with the language used by the Texas Supreme Court and in a manner
that recognizes the distinct purpose for this exception.

We begin by examining the language used by the Prudential
court to describe this exception:

[A] buyer is not bound by an Aas is@ agreement if he is entitled to
inspect the condition of what is being sold but is impaired by the seller=s conduct.  A seller cannot obstruct an inspection
for defects in his property and still insist that the buyer take it Aas is@. 

Prudential Ins. Co. of Am., 896 S.W.2d at 162. (emphasis added).








The only case we have found that actually analyzes the proper
application of this exception is Prudential itself.[12] 
See id. at 163.  In Prudential,
the buyer asserted the seller had Ainterfered with his investigation@ by withholding plans and
specifications the buyer had requested.  See
id.  The Prudential court
stated that withholding such plans and specifications could not have interfered
with the buyer=s inspection.  It noted that the withheld plans and
specifications did not mention if an asbestos-containing material was used in
the construction of the building and that the only way to determine whether the
building contained asbestos was to Ainspect the premises.@ 
See id.  According to the Prudential
court, the buyer did not claim that the seller had interfered with his
inspection in any way.  See id.  By this statement, the Prudential
court recognized a distinction between an inspection of the property and an
investigation of that property.  The Prudential
court noted that the buyer was asserting that the seller had interfered with
its investigation of the property by withholding information about the property
but that this assertion was not equivalent to an assertion that the seller had
interfered with the buyer=s inspection of the property.  See id.  








This distinction is consistent with the plain meaning of
these words;  Ainspect@ focuses on a careful physical
examination, whereas Ainvestigation@ includes a physical examination as well as a gathering of
information through research and study.  See
Webster=s Third New
International Dictionary
1170 (1993 ed.) (defining Ainspect@ as Ato view closely and critically (as in order to ascertain
quality or state, detect errors, or otherwise appraise): examine with care:
SCRUTINIZE@ and defining Ainspection@ as Athe act or process of inspecting: a
strict or close examination . . . the examination of articles of commerce to
determine their fitness for transportation or sale@); id. at 1189 (defining Ainvestigate@ as Ato observe or study closely: inquire
into systematically: EXAMINE, SCRUTINIZE@ and defining Ainvestigation@ as Athe act or process of investigating:
detailed examination: STUDY, RESEARCH@). 
In the absence of further guidance from the Texas Supreme Court, we
conclude that the Prudential court intended the second Prudential
exception to apply to a seller=s conduct that impairs, obstructs, or interferes with a buyer=s inspection of the property
being sold but not to conduct that impairs, obstructs, or interferes with a
buyer=s investigation of that
property.  See id; Prudential
Ins. Co. of Am., 896 S.W.2d at 162B63. 
Therefore, to trigger the impairment-of-inspection exception, the
seller, by its conduct, must impair, obstruct, or interfere with the buyer=s exercise of its contractual right
to carefully view, observe, and physically examine the property.  Conduct by the seller that impairs,
obstructs, or interferes with the buyer=s ability to obtain information regarding the property does
not trigger this exception.  

It is important to recognize that, in analyzing the
applicability of the impairment-of-inspection exception, we presume there was
no fraudulent inducement of any party to enter into the contract containing the
as-is or waiver-of-reliance language.  In
other fact patterns, conduct that allegedly fraudulently induced a party to
enter into the contract may be mixed with conduct that allegedly impaired a
party=s ability to inspect the property
before entering into the contract. 
However, no such facts are contained in the record before us.  Whatever the fact pattern may be, we still
analyze the impairment-of-inspection exception separately from the
fraudulent-inducement exception.  See
Prudential Ins. Co. of Am., 896 S.W.2d at 162B63. 
Although Warehouse Associates asserts that both exceptions apply in this
case, in analyzing the impairment-of-inspection exception, we presume that
there has been no fraudulent inducement to enter into the contract.








If, in the absence of duress or fraudulent inducement, a
sophisticated buyer and seller freely enter into an as-is real estate sales
transaction in which the buyer agrees not to rely upon any warranty by the
seller (other than seller=s warranty of title in the deed) or upon the seller=s statements or representations or
upon any other information provided by the seller, then it would not be
reasonable to refuse enforcement of the parties= agreement based on the buyer=s alleged reliance on the seller=s statements in conducting the buyer=s inspection.  If statements upon which the buyer is not
supposed to rely alone are sufficient to constitute impairment of inspection in
a transaction involving sophisticated parties, then the exception would swallow
the rule and render the waiver-of-reliance language and the Aas is@ nature of the
transaction meaningless.  In this case,
sophisticated parties, represented by counsel, structured an arm=s length
commercial transaction in a way that allocated the risk of discovering adverse
property conditions entirely to the buyer, and the parties placed the burden of
inspecting the property for such conditions entirely on the buyer.  Under these circumstances, it is reasonable
to enforce these contractual provisions. Likewise, it would be reasonable to refuse enforcement of
these contractual provisions if the seller engaged in conduct that impaired,
obstructed, or interfered with the buyer=s exercise of its contractual right
to carefully view, observe, or physically examine the property.  

This interpretation follows from the Prudential court=s analysis of whether the
impairment-of-inspection exception applied in that case.  See Prudential Ins. Co. of Am., 896
S.W.2d at 162B63. 
This interpretation is also faithful to the precise meaning of the words
our high court used to define the standard. 
See Prudential Ins. Co. of Am., 896 S.W.2d at 162 (stating that
the buyer is not bound by as-is and waiver-of-reliance language Aif he is entitled to inspect the
condition of what is being sold but is impaired by the seller=s conduct@) (emphasis added). And, importantly,
this interpretation also makes sense in the context of these types of
transactions.  

Turning to the summary-judgment evidence, Warehouse
Associates asserts there is a genuine issue of fact as to the
impairment-of-inspection exception based on summary-judgment evidence showing
the following:

!         Celotex
knew that, on February 10, 2000, while performing an excavation, Eagle
Construction & Environmental Services, Inc. (AEagle@) had uncovered what appeared to Eagle=s employee to be a large ball of raw asbestos buried
in the ground on the Property.

!         When
asked by Eagle what to do with this suspected asbestos-containing material,
Celotex instructed Eagle Abackfill the excavation,@ that
is, to cover the material with dirt and leave that area alone.  








!         Celotex
knew asbestos waste had been buried in the soil on the Property, and Colburn
knew that Eagle recently had discovered suspected asbestos-containing material,
yet Colburn did not mention the issue of asbestos in the soil to HBC. Colburn
stated that he was not aware of any environmental concerns other than those he
had discussed.  Colburn told HBC that, to
his knowledge, there was no hazardous waste or any kind of contamination on the
ground.

!         Celotex
knew that in the past asbestos had been used in the manufacturing process in
the plant on the Property.  However,
Murry told HBC (1) the only product Celotex manufactured on the Property was
asphaltic roofing shingles; (2) the wastes associated with the process were Adumpster-type of waste@ that
did not need to be listed on a manifest for disposing of regulated materials;
(3) Celotex=s manufacturing was similar throughout the tenure of
Celotex=s operation for twenty to thirty years; (4) this
manufacturing process did not really generate any waste except for what went
into Adumpsters or roll-off boxes@; and (5) the company that previously operated the
site also made asphaltic roofing materials in a manner similar to Celotex.

!         Celotex
did not give HBC or Warehouse Associates the 1988 plant map and the part of the
1996 environmental assessment that indicate that asbestos had been used in the
manufacturing process on the Property in the past.

!         Celotex
refused to agree to remove the concrete slabs that remained after removal of
the structures from the Property.    








Almost all of the evidence cited by Warehouse Associates
shows alleged fraudulent misrepresentations or nondisclosures of information by
Celotex concerning the condition or prior use of the Property.  As discussed above, even presuming the truth
of all such evidence, this proof does not raise a fact issue as to Celotex=s alleged impairment of Warehouse
Associates=s inspection of the Property.  See Prudential Ins. Co. of Am., 896
S.W.2d at 162B63. 
Celotex=s failure to gratuitously remove the
concrete slabs under the structures it had demolished and removed did not
impair Warehouse Associates=s inspection.  The
parties agreed in the Contract that the concrete slabs would be left in
place.  The summary-judgment evidence
does not reflect that it was impossible for Warehouse Associates to test the
soil under these slabs.  In any event,
these slabs were a preexisting part of the Property, and Celotex=s failure to remove them cannot
constitute an impairment of Warehouse Associates=s inspection.  Celotex=s instruction to its contractor to
backfill the excavation containing the suspected asbestos-containing material
returned the Property to its prior condition before the contractor began
excavating.  There is no evidence that
Celotex removed any suspected asbestos-containing material from the soil, and
Warehouse Associates was free to test any part of the Property, including this
particular material.  In fact, near the
end of the inspection period, Celotex gave HBC a map showing areas of the
Property that had been backfilled.  HBC
did not attempt to take soil samples from these areas.  








Warehouse Associates does not assert on appeal that Celotex
impaired, obstructed, or interfered with its ability to carefully view,
observe, and physically examine the Property. The summary-judgment evidence
shows that Warehouse Associates and HBC had access to the Property and were
free to take whatever soil and water samples they wanted to take for testing.[12] 
The record shows that, if Warehouse Associates or its contractor had
tested seventy soil borings taken from all over the Property for asbestos, as
was done after the closing of the sale, Warehouse Associates would have
discovered the asbestos contamination in the soil.  Celotex did not impair Warehouse Associates=s ability to perform such
testing.  Warehouse Associates and its
contractor chose not to do so. Warehouse Associates argues that Colburn made
fraudulent misrepresentations and failed to disclose material facts to HBC,
allegedly knowing that HBC would rely upon this information in deciding what
type of soil testing to do in its inspection. 
Although there is evidence to the contrary,[13] even presuming that this is true,
such fraudulent conduct would not have impaired Warehouse Associates=s ability to view, observe, and
physically examine the Property. As discussed above, under the applicable legal
standard, we do not consider the impact of any alleged statements by the seller
regarding the condition of the Property on the buyer=s decision as to what kind of
inspection to undertake.  Consistent with
the context of a sale on an Aas is@ basis with a waiver-of-reliance provision in the contract,
in determining the applicability of the impairment-of-inspection exception, we
consider only the impact of the seller=s conduct on the buyer=s actual inspection of the property=s condition.

Except for the warranty of title contained in the deed, Warehouse
Associates agreed not to rely upon any statements by Celotex regarding the
Property, and it bargained for the opportunity to conduct an independent investigation and
inspection before closing the sale.  The
scope of this investigation and inspection was solely Warehouse  Associates=s decision.  As a practical matter, Warehouse Associates
could choose to rely upon or be influenced by Celotex=s statements in
deciding the scope of its environmental testing and inspection; however, if it
chose to do so, it did so at its peril and that decision provides no basis to
avoid enforcement of the Contract Language. 
As the buyer, Warehouse Associates had to decide the nature and scope of
its environmental investigation and inspection because it is the one who either
had to accept the property Aas is@ or decline to
proceed with the transaction, without relying on anything Celotex said. Under
the Contract, Celotex had no obligation to furnish any documents or records
regarding the Property and made no warranties, representations, covenants, or
promises regarding the Property=s condition. Given
the structure of this transaction and the sophistication of the parties, in
assessing whether Celotex impaired the inspection, it is not appropriate to
focus on whether Celotex=s statements impacted Warehouse Associates=s decision-making
process as to the depth and breadth of the inspection;  the parties agreed that decision was for
Warehouse Associates to make, with Warehouse Associates assuming the risks of
opting for a less thorough, less expensive, and less time-consuming inspection
of the Property.   








            In
sum, Warehouse Associates does not assert, and the record does not show, a fact
issue as to whether Celotex impaired, obstructed, or interfered with Warehouse
Associates=s exercise of its contractual right
to carefully view, observe, and physically examine the Property. We conclude
that the summary-judgment evidence proved as a matter of law that Celotex did
not engage in conduct that impaired, obstructed, or interfered with Warehouse
Associates=s inspection of the Property.  Therefore, the impairment-of-inspection
exception provides no basis to bar enforcement of the Contract Language.  Accordingly, we overrule Warehouse Associates=s first issue to
the extent it alleges the summary-judgment evidence raises a genuine issue of
fact as to the impairment-of-inspection exception. 

C.        Does Warehouse
Associates=s independent investigation of the Property=s condition preclude its assertion
that it was induced to enter into the Contract by a fraudulent representation
or concealment of information by Celotex? 

In the trial court and on appeal, the Celotex Parties also
have argued, without relying on the Contract Language, that Warehouse
Associates=s claims fail as a matter of law
under Bartlett v. Schmidt because Warehouse Associates undertook its own
investigation of the Property=s environmental condition. 
See 33 S.W.3d 35, 37B38 (Tex. App.CCorpus Christi 2000, pet.
denied).  In Bartlett, the court
relies primarily on Marcus v. Kinabrew, 438 S.W.2d 431, 432 (Tex. Civ.
App.CTyler 1969, no writ).  See Bartlett, 33 S.W.3d at 38.  Bartlett did not involve as-is or
waiver-of-reliance language, and it did not cite Prudential or Schlumberger.  See id.  To the extent that Bartlett, Marcus,
or the cases cited therein hold that a buyer=s independent investigation, without
more, is sufficient as a matter of law to defeat an assertion that the seller
fraudulently induced the buyer to enter into the contract, these cases are
contrary to Prudential, Schlumberger, and the cases cited
therein. See Schlumberger Tech. Corp., 959 S.W.2d at 179B81; Prudential Ins. Co. of Am., 896 S.W.2d at 162B63. 
Therefore, the trial court erred if it granted summary judgment based on
this ground of the Celotex Parties= motion.  Accordingly, we sustain Warehouse Associates=s second issue to this extent.

D.        Did the trial court err in granting
summary judgment based on the doctrines of estoppel by contract and estoppel by
deed?








The Celotex Parties also moved for
summary judgment based on the doctrines of estoppel by contract and estoppel by
deed.  The Celotex Parties assert that,
under these doctrines, the terms of the Contract bind Warehouse Associates so
that Warehouse Associates cannot take a position inconsistent with these
terms.  First, the Texas Supreme Court
has indicated that, if either of the two Prudential exceptions apply, a
party may take a position inconsistent with the waiver-of-reliance and as-is
language in that party=s contract. See Prudential Ins. Co., 896 S.W.2d at
162.  Second, the doctrines of estoppel
by contract or by deed apply only in the absence of fraud.  See, e.g., Masterson v. Bouldin,
151 S.W.2d 301, 307 (Tex. Civ. App.CEastland 1941, writ ref=d) (stating that AIf, in making a contract, the parties
agree upon or assume the existence of a particular fact as the basis of their
negotiations, they are estopped to deny the fact so long as the contract
stands, in the absence of fraud. . .@) (emphasis added, quotations
omitted). Because the summary-judgment evidence raises fact issues as to the
fraudulent-inducement exception under Prudential, we conclude the trial
court erred to the extent it based its summary judgment on the doctrines of
estoppel by contract and estoppel by deed. 
Accordingly, we sustain Warehouse Associates=s third issue.  

                                                             V. 
Conclusion








Based on the record before this court,
we conclude that this case does not fall within the scope of Schlumberger
Technology Corp. v. Swanson.  After
carefully reviewing the summary-judgment evidence under the applicable standard
of review, we conclude that there is a genuine issue of fact as to whether
Warehouse Associates was induced to enter into the Contract by Celotex=s alleged fraudulent
misrepresentation or concealment of asbestos contamination in the soil on the
Property.  Based on Prudential, we
conclude that the impairment-of-inspection exception is limited to conduct by
the seller that impairs, obstructs, or interferes with the buyer=s exercise of its contractual right
to carefully view, observe, and physically examine the property.  Under the applicable standard of review, we
conclude that the summary-judgment evidence proves as a matter of law that
Celotex did not engage in such conduct. 
The Celotex Parties argue that, absent reliance upon the Contract Language,
Warehouse Associates=s claims fail as a matter of law under Bartlett v. Schmidt.  This argument lacks merit and does not
provide a basis for this court to affirm the trial court=s judgment.  Because of the genuine issue of fact as to
the fraudulent-inducement exception, the trial court erred in enforcing the
Contract language as a matter of law and in granting summary judgment based on
the doctrines of estoppel by contract and estoppel by deed.  

In its fourth issue, Warehouse Associates argues that the
Celotex Parties were not entitled to partial summary judgment limiting
Warehouse Associates=s potential damage recovery based on various arguments the
Celotex Parties asserted in their summary-judgment motion.  However, in its final judgment, the trial
court granted the Celotex Parties= AMotion for Partial and Full Summary
Judgment that Plaintiffs take nothing on all their claims.@ (emphasis added).  In this 
judgment, the trial court ordered that Warehouse Associates take nothing
and that its claims be dismissed with prejudice.  In the part of the motion for summary
judgment attacked in Warehouse Associates=s fourth issue, the Celotex Parties
asserted various ways in which they claimed Warehouse Associates=s damages would be limited even if
liability were established. For example, they asserted that Warehouse
Associates could not recover lost profits. 
The Celotex Parties did not argue that, upon a finding of fraud, Warehouse
Associates would not be entitled to rescind the Contract.[14] 
The Celotex Parties did not assert that Warehouse Associates suffered no
damages at all as a matter of law. Because the grounds in this part of the
motion do not seek a take-nothing judgment against Warehouse Associates, they
are not independent grounds for the take-nothing summary judgment granted by
the trial court.  Therefore, we need not
and do not consider these issues on appeal. 
Accordingly, we do not reach Warehouse Associates=s fourth issue.  








In accordance with our
rulings in this appeal, we reverse the trial court=s judgment and remand this case to
the trial court for further proceedings consistent with this opinion. 

 

 

 

 

 

/s/        Kem Thompson Frost

Justice

 

 

 

Judgment rendered and Opinion filed March 30, 2006.

Panel
consists of Justices Fowler, Frost, and Seymore.











[1]  Most of the
summary-judgment evidence does not distinguish between the three appellants,
all of which have AWarehouse Associates@ in
their names.  Warehouse Associates
Development, Inc. is a party to the contract for sale of the Property.  Warehouse Associates Corporate Centre Post
Oak, Ltd. is the grantee in the deed from Celotex.  Because the distinctions among the corporate
entities are not relevant to the issues on appeal, for convenience, we refer to
the appellants collectively as AWarehouse Associates,@ unless
otherwise specified.  Even though we
refer to three entities, we use the singular noun, AWarehouse Associates.@





[2]  The Celotex
Parties also sought a partial summary judgment requiring Warehouse Associates
to accept Celotex=s tender to buy back the Property for the amount paid
by Warehouse Associates plus interest, without prejudice to the pending claims
in this case and without admitting that the Celotex Parties engaged in any
actionable conduct. The trial court denied the Celotex Parties= motion for summary judgment in this regard, and the
Celotex Parties have not appealed this ruling. 






[3]  A deputy
district clerk apparently faxed the orders reflecting these rulings to counsel
along with a fax cover sheet describing the trial court=s rulings.  The
fax cover sheet was signed by the clerk but not signed by the trial court.  On appeal, the Celotex Parties assert that
this fax cover sheet conveys the trial court=s
summary-judgment rulings.  We
disagree.  A letter is not the proper
method for apprising the parties of summary-judgment rulings.  Shannon v. Tex. Gen. Indem. Co., 889
S.W.2d 662, 664 (Tex. App.CHouston [14th Dist.] 1994, no writ). Therefore, we do
not consider the fax cover sheet and instead base our review on the trial court=s summary-judgment orders and final judgment.





[4]  The Prudential
court also recognized that other aspects of a transaction may make as-is or
waiver-of-reliance language unenforceable. 
See Prudential Ins. Co., 896 S.W.2d at 162.  The Prudential court indicated that,
even absent fraudulent inducement or impairment of inspection, such language
still may not be enforceable based on consideration of the totality of the
circumstances, including such factors as (1) the sophistication of the parties
and whether they were represented by counsel, (2) whether the contract was an
arm=s length transaction, (3) the relative bargaining
power of the parties and whether the contractual language was freely
negotiated, and (4) whether that language was an important part of the parties= bargain, not simply added in a Aboilerplate@
provision.  See id.  Although this possible basis for invalidating
the Contract=s language is not at issue in this appeal, we note
that the two Prudential exceptions at issue in this case are not the
only potential grounds for invalidating such language.  See id.





[5]  The Celotex Parties argue that Prudential
applies only to as-is language and not to waiver-of-reliance language.  We disagree. Although the Prudential
court referred to the contract language at issue in that case as an A>as is= provision,@ the provision in question
contained both waiver-of-reliance and as-is language.  See Prudential Ins. Co., 896 S.W.2d at 160B61.  Therefore, the Prudential exceptions
apply to both types of language.  See
id. at 161B62; Bynum v. Prudential Residential Servs., Ltd. P=ship, 129
S.W.3d 781, 787B92 (Tex. App.CHouston
[1st Dist.] 2004, pet. denied) (applying Prudential exceptions to
contract containing both waiver-of-reliance and as-is language); Nelson v.
Najm, 127 S.W.3d 170, 173, 175B76 (Tex.
App.CHouston [1st Dist.] 2003, pet. denied) (same as Bynum).






[6]  The Schlumberger court left
the impairment-of-inspection exception from Prudential completely
intact.  See Schlumberger Tech. Corp.,  959 S.W.2d
at 181; Prudential Ins. Co., 896 S.W.2d at 162.  





[7]  The Celotex
Parties present policy arguments for a rule that, regardless of any alleged
fraudulent inducement, would enforce freely negotiated as-is and
waiver-of-reliance provisions in a deliberately negotiated contract between
sophisticated parties, so as to bar fraud claims by a buyer who undertook the
obligation to inspect property before the sale and who, after having been given
the opportunity to do so, elected to purchase the property Aas is.@  Regardless of
the merits of these policy arguments, the Prudential exceptions still
apply, based on the opinions in Schlumberger and Prudential.





[8]  This holding
is consistent with IKON Office Solutions, Inc. v. Eifert, in which this
court held that Schlumberger applied to a contract that sought to end a Alengthy and intense dispute.@  See 125
S.W.3d 113, 125B28 (Tex. App.CHouston
[14th Dist.] 2003, pet. denied). 
Furthermore, IKON Office Solutions did not cite the Prudential
exceptions or discuss how Schlumberger affects these exceptions.  See id.





[9]  The Celotex
Parties assert that Warehouse Associates is charged with knowledge of all
information in the Apublic record,@ such as
documents filed in Celotex=s bankruptcy case in Florida, the contents of the
Federal Register, documents in public libraries, and documents available from
the Texas Department of Health.  The only
case the Celotex Parties cite for this proposition is Mooney v. Harlin,
622 S.W.2d 83 (1981).  However, the Texas
Supreme Court later clarified that parties are not charged with knowledge of
all public records.  See HECI Explor.
Co. v. Neel, 982 S.W.2d 881, 886B87 (Tex.
1998).  The Mooney court held that
a person interested in an estate admitted to probate is charged with notice of
what the will provides and that a claim for fraud based on exclusion from a
will must be brought within the applicable limitations period.  See id. at 887.  However, the Mooney case cannot fairly
be interpreted to mean that parties are charged with knowledge of all public
records.  See id.





[10]  The Celotex
Parties also rely on one page of HBC=s April
19, 2000 report, which states that Awhite
fluff material@ was found at approximately a twelve-foot depth in one
of the soil borings done by HBC.  The
report does not say that this material was asbestos.  Although this material=s characteristics could have raised suspicions that
the material was asbestos, the summary-judgment record does not show that
Warehouse Associates learned of the discovery of this material before the end
of the inspection period.  In any event,
even if Warehouse Associates knew during the inspection period that there was
white fluff material in one soil boring, this knowledge would not prove as a
matter of law that Warehouse Associates knew the soil on the Property was
contaminated with asbestos.





[11]  (emphasis
added).  





[12] Warehouse Associates cites Kane and Nelson.  See Kane, 2005 WL 497484, at *6B8; Nelson, 127 S.W.3d at 175B76.  Though these cases allude to
impairment of inspection, they do not contain any analysis of what constitutes
impairment of inspection. See Kane,
2005 WL 497484, at *6B8; Nelson, 127 S.W.3d at 175B76. 
Kane indicates that the seller=s fraudulent misrepresentations regarding the car in question
discouraged the buyer from inspecting the car before buying it.  See Kane, 2005 WL 497484, at *1, 6B8. 
Nonetheless, there was a fact issue as to whether those same alleged
fraudulent misrepresentations (as well as
others) induced the buyer to purchase the car, and the intermediate court based
its ruling on the fraudulent-inducement exception.  See id.  In Nelson, the court states in passing
that the seller thwarted the buyer=s
attempt to inspect the real property in question and notes that the seller told
the buyer that an inspection was unnecessary, a waste of money, and that he had
been operating the gas station for thirty years with no problems from the
government.  See Nelson, 127 S.W.3d at 173, 175.  Though the buyer apparently took the seller=s advice and declined to exercise
his right to conduct an environmental inspection, the intermediate court based
its decision on the fraudulent-inducement exception and did not analyze whether
the impairment-of-inspection exception applied. 
See id. at 175B76.  Because the Nelson court=s focus is not on the impairment issue, it is not
clear whether the seller simply discouraged the buyer from choosing to conduct
an environmental inspection or whether the seller also denied the buyer access
to the property for such an inspection.  See id. at 173, 175B76.  





[12]  Although not
asserted by Warehouse Associates on appeal, some summary-judgment evidence
indicates that HBC was not able to visit the Property until February 21, 2000
because of ongoing work being performed by Eagle.  However, at his deposition, Martens of HBC
characterized this situation as a delay or postponement of HBC=s appointment to February 21, 2000, rather than as an
unsuccessful attempt to visit the Property. 
Martens did not indicate that this delay caused HBC any problems in its
work, and he testified that HBC had full access to the Property on the dates
that it visited the Property. Martens testified that HBC visited and inspected
the Property on February 21 and 24, 2000, and that HBC did not need to revisit
the site after February 24, 2000, to complete its Phase I report.  HBC returned to the Property on March 14,
2000, and took soil and water samples.





[13]  For example,
Colburn testified at his deposition that he understood that Warehouse
Associates was a sophisticated buyer that was doing its own environmental
evaluation of the Property and that Warehouse Associates was not relying on any
information Celotex provided.





[14]  At times, the
Celotex Parties appear to argue that Celotex=s offer
to Warehouse Associates to buy back the Property is equivalent to the remedy of
equitable rescission.  Given that such a
reconveyance would not affect the validity of the prior conveyance from
Celotex, would not resolve the claims in this case, and would not involve a
finding that the Celotex Parties committed fraud, we do not view such a
repurchase as being equivalent to a rescission remedy based on fraud.